## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                                                          **Case No. 8:09-cr-585-T-24TBM**

**JOHN MORGAN and**
**MARIAN MORGAN,**

       **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the court on referral by the Honorable Susan C. Bucklew for a report and recommendation on Defendant Marian Morgan's **Motion to Suppress** (Doc. 65).[1]  The government has filed a response in opposition (Doc. 66), to which a joint reply was filed (Doc. 70).  An evidentiary hearing was conducted March 16, 2011.  Post-hearing submissions were filed (Docs. 107, 111-13).  For reasons set forth below, the court recommends that the motion (Doc. 65) be granted in part and denied in part.

I.

A.

By her motion (Doc. 65), Marian Morgan ("Ms. Morgan" or "Defendant") seeks to suppress all evidence obtained by the government in a warrantless seizure and search of her

---

[1]Co-Defendant John Morgan filed a **Motion to Adopt and Join Co-Defendant Marian Morgan's Motion to Suppress** (Doc. 71) and a separate **Motion to Suppress** (Doc. 91).  On June 15, 2011, Mr. Morgan pleaded guilty to two counts of the Superseding Indictment (Doc. 122).  As part of the plea proceeding, Mr. Morgan's counsel acknowledged that he was waiving any further claims under these motions.

belongings apart from those matters obtained as a result of her consent.  Included within this material are written communications between her and her husband, co-defendant John Morgan.  (Marian and John Morgan are collectively referred to herein as "the Morgans" or "the Defendants").  She argues that such communications are the subject of marital privilege, and, in some instances, merit protection under the attorney/client privilege.[2]

In response, the government sets forth a chronology of events beginning with the Defendants' arrest in Sri Lanka and culminating with a detailed search of their property upon arrival in Tampa, Florida.  While conceding that none of the searches conducted in this case were pursuant to a warrant, the government urges that a warrant was not necessary because the initial search and seizure of this property was conducted by Sri Lankan officials conducting their own investigation, the initial search in the United States was a standard border search of incoming luggage and carry-on items belonging to the Defendants, and the subsequent searches were justified as valid inventory searches.  In the case of Marian Morgan, the government claims she consented to the search of a number items including a computer, hard drives, and multiple cell phones.

B.

The government introduced the testimony of two special agents with the Federal Bureau of Investigation (FBI).  Barbara Collazo ("Collazo") is a Special Agent with the FBI working white collar crimes and one of the investigators in the Morgan matter.  She has received training in the conduct of warrantless searches and seizures and introduced a portion

---

[2]As agreed at the hearing, the court will resolve the Fourth Amendment issues first and will not resolve the privilege issues on this report and recommendation.

of the FBI handbook related to the conduct of inventory searches.  *See* Gov't Ex. 1.  By Collazo's account, she complied with this policy of the FBI in the conduct of her inventory searches.

Collazo testified that she learned of the Defendants' arrest in Sri Lanka from an Assistant U.S. Attorney in August 2009.  By her account, at the time of their arrests, there were outstanding arrest warrants for both arising from a civil enforcement proceeding in this court before Judge Richard A. Lazzara at which the Defendants had failed to appear on an order to show cause.[3]  The arrest of Ms. Morgan is evidenced by a copy of an arrest receipt from Sri Lanka dated August 13, 2009, on charges for submitting forged documents and attempting to cheat money, offenses which Collazo equates with a money laundering offense in this country.  *See* Gov't Ex. 2.

Through communications with Sri Lankan officials, Collazo learned that they had seized property from the Morgans including a laptop, phones, luggage, and financial documents.  Later, upon her arrival in Sri Lanka, Collazo learned that the property, including documents and the contents of the computers, had been examined by the Sri Lankan authorities.  The Morgans' passports were also seized by the Sri Lankan authorities.

Upon learning of the Morgans' arrests, Collazo prepared a criminal complaint for the arrest of the Morgans based on wire fraud allegations.  The complaint (Gov't Ex. 3) was signed before Magistrate Judge Thomas G. Wilson on August 24, 2009, and arrest warrants

---

[3]The case is identified in Ms. Morgan's motion as Case No. 8:09-cv-1093-26-EAJ.  It was a civil enforcement proceeding by the Securities and Exchange Commission against the Morgans and others for alleged securities fraud.  The court file reveals that when the Morgans failed to appear at a show cause hearing before Judge Lazzara, he ordered their arrest.

3

were issued for the Morgans.  Additionally, the government initiated the process for the

extradition of the Morgans.  During this process in November 2009, Collazo learned that the

Morgans had some immigration issues in Sri Lanka and that a decision was made to deport

them.  To assure their return to the United States, on December 9, 2009, Collazo and three

other federal agents traveled to Sri Lanka.

   Upon arrival in Sri Lanka, the agents were permitted to review the Sri Lankan case

file and to view documents found on a laptop computer of the Defendants and in blue file

folders taken from the Morgans.  In the agent's observation, quite a few of the documents

were relevant to the government's investigation.  At the time, the government agents did not

undertake to search the computer or to open any sealed envelopes.  Sri Lankan officials also

advised the agents to be on the look out for handwritten letters between the Morgans that they

had exchanged while in jail.  Based on their review, the Sri Lankans believed the

communications contained information pertinent to the government's investigation.  At the

time of their detention in Sri Lanka, the Morgans were represented by legal counsel from both

Sri Lanka and the United States.

   While Collazo did not witness this, she testified that the Defendants' property was

returned to them shortly before they arrived at the airport for departure on a flight bound for

the United States via Frankfurt, Germany.  Six pieces of luggage were checked on the flight

and the Defendants had carry-ons as well.  Ms. Morgan carried on a laptop bag.  During the

trip, she was also seen carrying one or two cell phones, which she attempted to use to make

calls during the flights.

Ultimately, the flight arrived at Washington Dulles International Airport (Dulles airport) in Virginia on December 11, 2009.  United States Customs agents had been advised of the criminal investigation and criminal complaint.  Collazo advised the agents of how much luggage the Morgans had and the fact there was evidence in the luggage in the nature of financial documents.  Accompanied by the federal agents, the Morgans' luggage was retrieved and they were escorted by Customs agents to a secondary area for a search of their baggage.  Two Customs agents undertook a search of the Defendants' luggage piece by piece.  The search lasted about forty-five minutes.  Items found in blue folders, along with lots of paper documents, and written communications were found and segregated by Customs agents who placed the items in separate plastic containers.  After clearing customs, the Defendants were formally arrested and jailed, and ultimately they were transported to the Middle District of Florida.  All their personal belongings were given to the FBI in Washington D.C., where an evidence technician inventoried them and gave "B" numbers to the various items.  *See* Gov't Ex. 6.  The property was then placed in an evidence vault at the FBI office in Washington, D.C.  Four to five weeks later, the property was transferred to the Tampa office of the FBI and placed in its evidence locker.  According to Collazo, the property arrived about the time the court's discovery order was issued.

Defendants were indicted December 17, 2009.  According to Collazo, the government was moving forward on a search warrant for the computers and cell phones.  However, on or about January 14, 2010, at a detention hearing for Ms. Morgan, Collazo was advised by her counsel that Ms. Morgan would consent to a search.  Thereafter, Ms. Morgan

signed a written Consent to Search form (Gov't Ex. 7), by which she agreed to permit the FBI

to conduct a search of items previously labeled as1B10, 1B14, and 1B15 on Gov't Ex. 6.[4]  The

consent was entered with the advice of two attorneys then representing Ms. Morgan.

According to Collazo, she asked one of Ms. Morgan's attorneys, Mr. Nortman, to read over

the form with Ms. Morgan.  She let them know of her concern that Ms. Morgan had the

authority to consent for shared items.  Ms. Morgan and Attorney Nortman spoke.  Ms. Morgan

did not wish to consent to the search of written communications or correspondence, only the

electronic items.  Suffice it to say that Collazo believed Ms. Morgan had the authority to

consent to the search of the electronic evidence on her own behalf and that of her husband.

Without obtaining a warrant, Collazo thereafter undertook what she describes as a

detailed inventory of all the Defendants' other property held by the FBI.  By this time, the

court had issued a discovery order and she and others undertook to copy and then digitize the

items reviewed and appropriate for discovery.  According to the witness, this was the first

time the FBI undertook a detailed and complete inventory of the items seized from the

Defendants.  Such was undertaken as part of the FBI's caretaking function.  The inventory

was conducted over a period of weeks.  Collazo did not attempt to open any sealed documents

---

[4]As the discussion about consent transpired, Collazo used the inventory originally created by the Washington, D.C., field office to identify those items for which the government was seeking the consent of Ms. Morgan.  Collazo did this by circling certain of the "B" numbers.  Ms. Morgan declined consent for some of the items as evidenced by those circled items through which Collazo drew a line.  *See* Gov't Ex. 6.  The bottom line is that Ms. Morgan consented to the search of the laptop computer, two hard drives, and five cell phones. She declined to give consent to the search of her luggage and the documentary evidence.

during this review of the evidence.  According to her, she maintained contact with the prosecutor, Mr. Terry Zitek, throughout the review.

On cross-examination, Collazo testified that Sri Lankan officials would have had knowledge of the investigation by the United States government by way of the Request for Provisional Arrest of the Defendants dated August 24, 2009, directed to the Secretary of Justice in Sri Lanka.  *See* Def. Ex. 2.  Ultimately, extradition was unnecessary.  In October 2009, the American Embassy in Sri Lanka notified both Morgans that their passports were revoked.  *See* Def. Exs. 4, 5.  Thereafter, Sri Lanka determined to remove the Defendants.

The United States government provided the tickets for the Morgan's flights out of Sri Lanka.  While the Defendants were not formally arrested on the United States charges, Collazo described their circumstances as a *de facto* custody situation for purposes of transporting the Morgans back to the United States; the Morgans were not at liberty to leave on their own.  At the stop-over in Frankfurt, Germany, the Morgans were placed in holding cells pending the flight to the United States.

Regarding the government's review of evidence in Sri Lanka, Collazo and other federal agents spent approximately one and a half days in Sri Lanka, a portion of which was spent viewing and reading hard copies of some of the items discovered by the Sri Lankans during their investigation.  This was not done pursuant to a search warrant.  As indicated above, Sri Lankan authorities had found certain documents in blue envelopes and agents were advised to be on the lookout for these items as well as certain written communications between the Defendants exchanged during their incarceration.  Reportedly, the jail guards who

7

ferried these letters back and forth between the Morgans had reviewed the communications and advised that such related to the United States government's allegations. Collazo claims that the seizure of the Morgans' property was pursuant to the Sri Lankan investigation and not the FBI's investigation. Collazo could not say whether the Morgans had the option of not bringing their luggage with them when they were delivered to the airport.

Collazo indicated that upon arrival at Dulles airport, the agents picked up the Morgans' bags and carried them to a secondary area along with the Morgans and Customs agents. Before their search, she advised the Customs agents there were six pieces of luggage and to be on the lookout for blue envelopes, financial documents, and hand written documents, and to put those items aside. As such items were discovered through the search of Defendants' luggage, they were placed in plastic evidence bags by Customs agents. No contraband, per se, was found. According to Collazo, Customs officials read the contents of some of the property before segregating it.

As for her later inventory search, although attorney Nortman had raised the marital privilege issue, the agent did not attempt to resolve that matter before she began. In this search, Collazo read the documents verbatim, page by page. As an example of what would have been reviewed in detail, Ms. Morgan introduced copies of letters between the Morgans. *See* Def. Ex. 7. Collazo denies that her search was for investigatory purposes but insists it was necessary for the protection of the agents and the Defendants and was necessitated by the court's discovery order. No search warrant was obtained for any of the items searched. Collazo was aware that the Morgans were represented by counsel while incarcerated in Sri

8

Lanka.  She acknowledged that government's exhibit 6 was created by the Washington bureau evidence technician.

On redirect, Collazo indicated that her inventory search was the first detailed one done by the FBI.  In a "white collar"case like this, she stated that there might have been stocks or negotiable instruments or perhaps exculpatory evidence within this volume of property that they needed to safeguard and thus the need for her in-depth search of each item.  Also, she needed to know what should go out on discovery.

Subsequent to the hearing, an exemplar of the "inventory" was filed with the court. *See* (Doc. 107).  It reflects an index of discovery digitized for submission to the Defendants and an exemplar of screen shots/copies of documents that were copied by the agents as they reviewed each of the seized items in Tampa.  The index suggests documents from items 1B1, 1B6-9, 1B11, and 1B16 were reviewed and copied electronically as matters of evidentiary value.[5]  *Id.*  Counsel advised that certain other the matters of a purely personal nature, excluding items of jewelry or money, were later returned to counsel for the Morgans.

The government also introduced the testimony of Keith Arndt ("Arndt"), an FBI Special Agent and member of the Computer Analysis Response Team.  Arndt was the field examiner tasked to conduct the forensic examination of the laptop computer, five cell phones, and two hard drives for which Ms. Morgan consented to search.  Given that Ms. Morgan does

---

[5]The government's submission notes that the focus of the suppression motion is items 1B11 and 1B16 for which Ms. Morgan declined to give consent, however, her motion seeks to address the whole of the exhibits searched and copied during this review of her property.

not dispute the search of these items[6] and the fact that Mr. Morgan has waived further

proceedings on the motion and pled, the testimony is not set forth further.

II.

The facts reveal multiple searches of the Defendants' property after the initial seizure

in Sri Lanka.  The initial search (or searches) was conducted by officials in Sri Lanka; this was

followed by a review of some of the seized evidence by the FBI and Sri Lankan officials; next,

the whole of the property was searched at the Dulles airport by Customs officials; thereafter,

an evidence technician with the FBI in Washington, D.C., inventoried the property before

placing it in an evidence locker; and finally, a series of so-called inventory searches were

conducted by the FBI at Tampa, Florida, some six weeks later.  By her pleadings and

arguments, Ms. Morgan raises Fourth Amendment concerns only with respect to the last series

of searches in Tampa.  Thus, she does not articulate a specific challenge to the initial search

and seizure of their property in Sri Lanka or to the sharing of some of this evidence with the

FBI agents upon their arrival in Sri Lanka.  Nor can she on this record.[7]  Nor is the focus of

---

[6]As discussed at the hearing, Ms. Morgan does not contest her consent and has waived
any objection to the evidence seized from the cell phones, laptop computer, and hard drives
for which she gave consent.  For trial purposes, she similarly waives any Fourth Amendment
issue concerning hard copies of any documents found on any of the computers, cell phones, or
hard drives for which she gave consent.

[7]Evidence seized by foreign police officers from searches conducted in their own
countries is "generally admissible in American courts regardless of whether the search
complied with the Fourth Amendment."  *See United States v. Rosenthal*, 793 F.2d 1214, 1230
(11th Cir. 1986) (citing *Gov't of Canal Zone v. Sierra*, 594 F.2d 60 (5th Cir. 1979)).  While
there are exceptions to this rule, *see id.*, they are not asserted here and the proffered evidence
does not support an exception.  Thus, the search and seizure in Sri Lanka does not "shock the
conscious" of the court, and while the agents in Sri Lanka appear to have acted to assist the
FBI, the FBI is not shown to have participated in that search and there is insufficient evidence

Ms. Morgan's motion on the search and seizure at the Dulles airport.  While citing certain

case law addressing border searches, Ms. Morgan concedes the validity of the search,

indicating in her post-hearing memorandum that "no document was actually searched by

Customs authorities beyond a search necessary to determine that there was no contraband

present or any threat to national security existed which is the level of search authorized by the

border exception of the search warrant requirement."  (Doc. 113 at ¶ 6).  As addressed below,

while I agree with her legal conclusion concerning the border search, I cannot agree with her

factual assessment of the search and seizure at Dulles airport.  In any event, as Ms. Morgan

constructs her argument, the gravamen of the Fourth Amendment claim is the warrantless

search(es) of her property by the FBI upon its arrival in Tampa, Florida.[8]  By her argument,

the detailed and in-depth search conducted by the agents in this case required a search warrant,

a fact the evidence indicates Agent Collazo knew full well.  In short, she argues that these so-

called "inventory" searches by the agents in Tampa were a pretext for investigatory searches

---

that the Sri Lankans conducting that search were "acting as agents for their American
counterparts . . ."  *See id.*  On this record, there is no Fourth Amendment claim regarding the
search(es) in Sri Lanka.

       [8]Additionally, as noted above, Ms. Morgan also claims the benefit of both the marital
privilege and attorney-client privilege regarding certain of the written communications seized
by the government and urges both privileges as further grounds for suppression.  While these
privilege claims raise issues of the admissibility of such evidence at trial, they do not
implicate Fourth Amendment concerns.  *See United States v. Squillacote*, 221 F.3d 542, 560
(4th Cir. 2000); *Lange v. Young*, 869 F.2d 1008, 1012 n. 2 (7th Cir. 1989); *United States v.
Marashi*, 913 F.2d 724, 731 n. 11 (9th Cir. 1990); and *Nickel v. Hannigan*, 97 F.3d 403, 409
(10th Cir. 1996).

of each and every document taken from Defendants and all such evidence arising from the searches should be suppressed.[9]  (Doc. 113 at 3-5).

By its response to the motion (Doc. 66) and its post-hearing memorandum (Doc. 112), the government argues that both the border search at the Dulles airport and the later inventory search in Tampa were valid even in the absence of a warrant.  Regarding the border search, the government cites numerous authorities for the proposition that government officials may search the luggage of individuals entering the country.[10]  According to the government, "routine" border searches may be conducted even in the absence of probable cause or reasonable suspicion.[11]  It also notes that border searches are valid even when non-routine if such are supported by reasonable suspicion.[12]  And, it contends that such searches are lawful even if prompted by information given to Customs officials by other law enforcement agents.[13]  In sum, the government contends that the search conducted by Customs officials was a valid border search.  In its view, the fact that Collazo advised the Customs officials of the nature of the charges and the evidentiary value of certain financial documents

---

[9]In support of this, Ms. Morgan cites *United States v. Khoury*, 901 F.2d 948 (11th Cir. 1990), and *United States v. Banks*, 482 F.3d 733 (4th Cir. 2007).

[10]*See Torres v. Puerto Rico,* 442 U.S. 465, 473 (1979); *United States v. Irving,* 452 F.3d 110, 123-24 (2d Cir. 2006); *United States v. Ickes,* 393 F.3d 501, 506-07 (4th Cir. 2005); *Kaniff* v. *United States,* 351 F.3d 780, 783-84 (7th Cir. 2003).

[11]*See Irving,* 452 F.3d at 123-24*; Bradley v. United States,* 299 F.3d 197, 202 (3d Cir. 2002); *but cf. Brent v Ashley,* 247 F.3d 1294, 1299-1300 (11th Cir. 2001).

[12]*See Irving,* 452 F.3d at 124.

[13]*See Irving,* 452 F.3d at 123-24; *United States v. Gurr,* 471 F.3d 144, 148 (D.C. Cir. 2006); *United States v. Bates,* 526 F.2d 966 (5th Cir. 1976).

likely to be found in the luggage is not legally significant.  And, it urges that the seizure of documents pursuant to this search was entirely lawful.[14]  (Doc. 112 at 11).

III.

A.

Given that Ms. Morgan does not dispute what took place in Sri Lanka, resolution of the motion begins with a discussion of the border search by Customs agents at the Dulles airport.  As noted above, Ms. Morgan does not argue, much less demonstrate, that the border search was unreasonable in contemplation of the Fourth Amendment.  Instead, by her argument, because nothing unusual occurred during the search and the court's focus is shifted to the later inventory searches in Tampa.  I cannot agree with Ms. Morgan's factual assessment of the border search.

Contrary to Ms. Morgan's suggestion that the search by Customs officials at Dulles was cursory at best, i.e., merely to ascertain that there was no contraband or other threat to national security, the evidence reveals a thorough and focused search of the whole of the

---

[14]In its initial response, the government also urges that case law permits the later search of a container if the search is simply a repeat of a previously conducted lawful private search or a search in a foreign country by that country's official.  In support, it cites *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994); *United States v. Pierce*, 893 F.2d 669, 674 (5th Cir. 1990); *Rosenthal*, 793 F.2d at 1230-31; and *United States v. Morrow*, 537 F.2d 120, 139-40 (5th Cir. 1976).  Here, there was no private search preceding the disputed searches but the Defendants' property was searched in Sri Lanka by its officials.  However, in the given facts, the property seized in Sri Lanka was returned to the Morgans shortly before they were removed from Sri Lanka.  The FBI made no claim to the property until the Morgans were arrested at the Dulles airport and their property was searched by Customs and then turned over to FBI agents for initial storage at the FBI office in Washington, D.C., by Customs.  Thus, the circumstances appear to be significantly different than those in *Rosenthal* and *Morrow*.

13

Defendants' property and the segregation (i.e., seizure) of particular items believed to be of evidentiary value.  By my consideration, the border search was entirely appropriate and the items seized by the Customs officials during the search which were segregated into plastic bags and returned to the agents[15] were lawfully seized and are not subject to exclusion on Fourth Amendment grounds regardless of the later "inventory" searches in Tampa.

The following passage from *Irving* is instructive as to the appropriateness of the border search:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  With few exceptions, warrantless searches are *per se* unreasonable.  One of those exceptions is a search at our nation's borders: "Border searches . . . from before the adoption of the Fourth Amendment have been considered 'reasonable' by the single fact that the person or item in question had entered our country from outside."  An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception.  Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion.  Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights.  To determine whether a non-routine search is reasonable, the offensiveness of the intrusion must be weighed against the level of warranted suspicion.

*Irving*, 452 F.3d at 123 (citations omitted).  Furthermore, as the government urges, the rule is unaffected by the fact that the search is prompted by other law enforcement agents or by an

---

[15]These items are identified as 1B11 on Gov't Ex. 6 and are described as "TWO CLEAR PLASTIC BAGS CONTAINING MISC. DOCUMENTS TO INCLUDE FILE FOLDERS, FEDERAL EXPRESS PACKAGES, HANDWRITTEN NOTES, BLUE FOLDERS, SPIRAL NOTEBOOKS, RED BOOK, ETC."

investigative motive.  *See id.*; *Gurr,* 471 F.3d at 148-49 (citing *United States v. Schoor,* 597

F.2d 1303 (9th Cir. 1979); *Bates*, 526 F.2d at 966-67.  *Gurr* is particularly instructive.

      In *Gurr,* the defendant was arrested for federal credit union fraud upon landing at the

Honolulu International Airport in Hawaii.  His luggage was searched by Customs agents who

seized financial documents related to the fraud at the behest of the FBI.  Gurr sought to

suppress the documents on grounds that the search was unreasonable because the FBI's

involvement in the search transformed a routine border search into an FBI fishing expedition.

As reported in the decision, Customs officials conducting the search asked the FBI agents

present at the search whether they should seize the financial documents.  Receiving an

affirmative response, the documents were seized by Customs and immediately turned over to

the FBI.  In rejecting the argument that an otherwise lawful border search was rendered

unreasonable because of the involvement of the FBI, the court noted that, "[c]ourts have

routinely rejected the notion that cooperation among federal agencies renders a border search

unlawful." *Gurr*, 471 F.3d at 148.  By the court's consideration, the FBI's request that

Customs seize any financial documents within the luggage did not alter the conclusion that the

Customs officials conducted a permissible border search and lawfully seized the documents.

*Id*. at 148-49.  As for the scope of the search, the court quoted with approval from *Schoor*:

> We recognize that the primary purpose of the border search
> is to seize contraband property unlawfully imported or
> brought into the United States.  However, where customs
> officers are authorized to search for material subject to duty
> or otherwise introduced illegally into the United States and
> they discover the instrumentalities or evidence of crimes,
> they may seize the same.

*Id.* at 149 (quoting *Schoor*, 597 F.2d at 1306).  And, the court noted further that, "[t]he distinction that Gurr would draw between contraband and documentary evidence of a crime is without legal basis." *Id*.

Against this legal backdrop, there can be no dispute that Customs performed a valid border search at the Dulles airport upon the Morgans' arrival into the United States.  As in *Gurr*, the fact that the FBI was present and advised Customs agents of the nature of the charges against the Morgans and requested they be on the lookout for particular matters of evidentiary value does not alter that conclusion.  As for the Customs official's segregation of such evidentiary items found within the Defendants' property into plastic bags, *Gurr* suggests such seizure was justifiable as within the scope of the routine border search and thus raises no Fourth Amendment concerns.  In sum, I agree with the parties that there was no violation of the Fourth Amendment in the Customs *search* of the Defendants' property.  Insofar as the Customs officials *seized* certain items believed to be of evidentiary value from the luggage, such too was justified under the border search exception to the warrant requirement.  Thus, to the extent of the items seized and segregated into separate plastic bags - the so-called 1B11 items - the seizure too was consistent with Fourth Amendment considerations.[16]  Given that the items in 1B11 were properly seized, I find no Fourth Amendment issue arising from the agents' subsequent warrantless review of these same matters upon their arrival in Tampa,

---

[16]In my view, even if the FBI's involvement in the border search rendered the search a non-routine search in the given circumstances, it is clear that the FBI was possessed of at least reasonable suspicion, if not probable cause, to believe that items of evidentiary value would be found in the luggage based on the prior briefing and review of evidence in Sri Lanka.  It is these items which the FBI requested that Customs be on the look out for as it began its search.

16

Florida.  *Cf. United States v. Jacobson*, 466 U.S. 109, 117 (1984) ("The Fourth Amendment is implicated only if authorities use information with respect to which the expectation of privacy has not already been frustrated.").

Ms. Morgan makes no complaint that her property was taken by the FBI and placed into an evidence locker in Washington D.C., for later transport to Tampa, Florida.  The seizure of the whole of the property after its search by Customs appears entirely consistent with the caretaker role assumed by the FBI upon the arrests of the Morgans.  The FBI had no alternative but to retain the property at that point and it was entirely appropriate that an evidence technician inventory the property prior to placing it into the evidence locker. However, as for the renewed searches of the property some six weeks later after the property was transported to Tampa, Ms. Morgan urges such were invalid in the absence of a warrant. Here, I agree with her argument.

## B.

It is beyond dispute that the Fourth Amendment generally requires law enforcement to obtain a warrant prior to conducting a search.  One of the well-delineated exceptions to the warrant requirement is consent, but here it is undisputed that Ms. Morgan expressly declined to consent to a search of anything other than her computer devices and cell phones.  *See* Gov't Ex. 6.  Consequently, the government urges another well-delineated exception as a basis to the searches in Tampa, namely, the "inventory" search.

Warrantless inventory searches are clearly authorized in the appropriate circumstances.  *South Dakota v. Opperman*, 428 U.S. 364, 374-76 (1976).  However, as one

court has described such searches, they are "an incidental administrative step following an

arrest and preceding incarceration, conducted to protect the arrestee from theft of possessions,

to protect the police from false accusations of theft, and to remove dangerous items from the

arrestee prior to his jailing." *Banks,* 482 F.3d at 739 (citations omitted).  Inventory searches

must "be conducted according to standardized criteria."  *Id.* (quoting *Colorado v. Bertine,* 479

U.S. 367, 374 n. 6 (1987)).[17]  As the Supreme Court has stated, "an inventory search must not

be a ruse for a general rummaging in order to discover incriminating evidence.  The policy or

practice governing inventory searches should be designed to produce an inventory.  The

individual police officer must not be allowed so much latitude that inventory searches are

turned into 'a purposeful and general means of discovering evidence of a crime.'"  *Florida v.*

*Wells*, 495 U.S. 1, 4 (1990) (quoting *Bertine*, 479 U.S. at 376).  As stated by the Eleventh

Circuit,  "[a]n inventory search is not a surrogate for investigation, and the scope of an

inventory search may not exceed that necessary to accomplish the ends of the inventory."

*Khoury,* 901 F.2d at 958-59 (citations omitted).  "On the other hand, a legitimate non-

pretextual inventory search is not made unlawful simply because the investigating officer

remains vigilant for evidence during an inventory search."  *Id.* at 959 (citing *United States v.*

*Orozco*, 715 F.2d 158, 161 (5th Cir. 1983)).

     Citing *Khoury,* Ms. Morgan asserts that the searches cannot be justified as inventory

searches and instead were conducted for investigative purposes for the discovery of evidence.

---

[17]Here, Ms. Morgan raises no issue regarding the written criteria as set forth in the
legal handbook for special agents.

Attempting to distinguish *Khoury*, the government asserts that the later searches and copying of the Defendants' property by the FBI agents in Tampa were valid inventory searches and all such relevant evidence as revealed by the searches is admissible.

As set forth above, the facts reveal that Collazo and other agents were aware from their first contact with the Defendants that the Defendants' property contained items of evidentiary value.  At Dulles airport, they instructed Customs officials to be on the look out for such matters, and as a consequence, those officials seized numerous documents and matters from the Morgans' property and placed the items in separate containers.  That property, along with all the other of Defendants' property, was turned over to the FBI and, upon the Defendants' arrest, taken to an evidence locker at the FBI office in Washington, D.C., for safekeeping.  The documentary evidence reveals the property was inventoried by an evidence technician before it was secured in the evidence locker.  Some six weeks later, after Ms. Morgan had declined consent to search her tangible property, agents in Tampa undertook a weeks' long re-examination of every piece of documentary evidence seized from Ms. Morgan for evidentiary value under the guise of performing an inventory search.  By my consideration, the whole of the circumstances preclude a finding that the searches in Tampa were undertaken in furtherance of the FBI's caretaking function.  Rather, this inventory was a pretext for an investigatory rummaging through Ms. Morgans' property.  The detailed review and digitizing of each document went well beyond any previous search.  By my consideration, the conclusion reached in *Khoury* is appropriate in this case as well.  The government, having once lawfully searched the property and seized matters of evidentiary value at the border and

thereafter inventoried the same subsequent to Defendants' arrest for its safekeeping, was free to seek a search warrant.  Absent that, however, the government was precluded by Fourth Amendment considerations from the wholesale rummaging through Ms. Morgan's property in search of additional evidence.  As a consequence, all items of tangible evidence, apart from those identified as "1B11," should be suppressed from the government's case-in-chief.

IV.

Accordingly, I recommend that Defendant Marian Morgan's **Motion to Suppress** (Doc. 65) be **DENIED** as to the items lawfully seized during the border search and **GRANTED** as to all other items obtained as a result of the so-called inventory searches conducted by the FBI at Tampa, Florida.  The evidence seized from the Morgans' computers, hard drives, and cell phones is unaffected by this determination.  Further proceedings on the privilege issues raised in the motion to suppress will be calendared by separate order.

Respectfully submitted on this
20th day of June 2011.


THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE


**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual

findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1);

M.D. Fla. R. 6.02.


Copies furnished to:
The Honorable Susan C. Bucklew, United States District Judge
AUSA Cherie Krigsman, Attorney for the Government
Peter Sartes, Attorney for Defendant