**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

        Plaintiff,                            Case No.: 8:09-cr-00585-T24-TBM

v.

**MARIAN I. MORGAN,**

        Defendant.

_____/

## DEFENDANT MORGAN'S SENTENCING MEMORANDUM

Comes Now, the Defendant, Marian Morgan, by and through her undersigned counsel, and files this Sentencing Memorandum. As the Court is aware from the Presentence Investigation Report (PSR), Mrs. Morgan's counts of conviction (conspiracy to defraud the United States, wire fraud, transfer of funds taken by fraud, money laundering, and making false statement on tax returns) are Class C and D felonies. The PSR's recommendation of a Guidelines sentence of lifetime imprisonment places Mrs. Morgan in Zone D. For the reasons that follow, it is respectfully requested that this Court depart or grant a substantial variance and impose a sentence below the advisory Guideline range.

### DEFENDANT'S BACKGROUND

Marian Morgan was born in India on September 21, 1954. She was one of three daughters born to Peter Chaterjee and Evelyn Chatterjee, a former university professor. Peter Chaterjee, a decorated World War II hero, passed away in 2000 after a lifetime of military service. He was an enlisted member of the military for most of Marian Morgan's childhood, which caused him to be away from his family for extended periods of time.

1

In 1969, Marian Morgan moved to Canada with her family, where she lived for nearly 15 years. During this time, Mrs. Morgan was enrolled in the Master's Degree program at Concordia University in Montreal. Prior to her admittance to this program, Mrs. Morgan earned her Bachelor's Degree in Education from McGill University, also located in Montreal.

In 1985, Marian Morgan relocated to the United States and became a naturalized citizen in 2008. Upon moving to the States, Mrs. Morgan lived in Chicago, Wisconsin, and Knoxville before settling in Sarasota, Florida in 1997. Two years later, in 1999, Mrs. Morgan married John Morgan. Despite matters associated with this case and likelihood of continued imprisonment, Mrs. Morgan remains close to her husband and family, including her mother and two sisters, who reside in Ottawa, Canada.

## MEMORANDUM OF LAW

This memorandum addresses the question of what is the appropriate sentence for Mrs. Morgan based on her violations of 18 U.S.C. §§ 371, 1343, 2314, and 1957, in addition to 26 U.S.C. § 7206. The memorandum examines the issue of whether a Guidelines sentence is appropriate and whether downward departure is appropriate, and whether a variance from application of the Sentencing Guidelines should be granted pursuant to 18 U.S.C. § 3553(a), notwithstanding the calculation of the sentence determined by the Guidelines.

The first section of the memorandum examines the role of a sentencing court and the impact of the advisory Guidelines on federal sentencing. As this Court is well aware, recent Supreme Court cases reaffirm the discretion and preeminence of district courts in federal sentencing, notwithstanding the existence of the U.S. Sentencing Guidelines.

The second section of the memorandum analyzes the specific question of what sentence is appropriate for Mrs. Morgan based both under the Guidelines and based on the statutory

2

factors delineated in 18 U.S.C. § 3553(a). This section concludes that both a departure and variance are in order in this case.

## I.   The Sentencing Guidelines Cannot Restrict a Court's Discretion

A district court's discretion is no longer limited by the guidelines since its matrix is now considered merely advisory. *United States v. Booker,* 543 U.S. 220, 245-67. Indeed, it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States,* 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).

It is abundantly clear that district courts today enjoy "sizeable discretion" in sentencing. *United States v. Gall,* 552 U.S. at 56; *United States v. Pugh,* 515 F.3d 1189-90 (11th Cir. 2008). Utilization of the Guidelines in a manner other than as an advisory tool violates the Sixth Amendment rights of a defendant. Any contention that the Guidelines enjoy a presumption of reasonableness has been rejected. *See Rita v. United States,* 551 U.S. 338, 351 (2007).

A district court now has the ability and authority to impose a sentence, merely "because the case warrants a different sentence...," regardless of the range determined by a Guidelines calculation. *Id.* The only requirement is that a court consider the Guidelines as a factor along with the other factors delineated in § 3553(a) before reaching its final decision. *Kimbrough v. United States,* 522 U.S. 85 (2007). No extraordinary circumstances need be present nor any mathematical formula employed before a below Guidelines sentence may be imposed. *Gall,* 552 U.S. at 47-58. Judge Tjoflat, writing for the Court in *United States v. Glover,* 431 F.3d 744, 752-53 (11th Cir. 2005), recognized that in some cases, the Guidelines may have little persuasive effect in light of the § 3553(a) factors:

> Although 'judges must still *consider* the sentencing range contained in the Guidelines , . . . that range is now nothing more that a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [Section 3553(a)].'

*United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005).

Consistent with this, the Eleventh Circuit recently stated, "there is a range of choices for the district court, and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." *United States v. Jordan*, 582 F.3d 1239, 1249 (11th Cir. 2009).

A sentencing court, then, has not only the power, but also the responsibility, to mold an appropriate sentence—taking each and every defendant into account as an individual. The sentencing decisions made by this Court trump the Sentencing Guidelines.

## II.    The § 3553 Factors Applied to Mrs. Morgan's Case

The goal of sentencing is to impose the least onerous sentence consistent with the purposes of sentencing, which Congress has identified as punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (providing that a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of the specific case through the lens of seven factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective

manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established . . .;
(5) any pertinent [Sentencing Commission] policy statement . . .;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Against this backdrop of factors, a variance based on the § 3553(a) factors is warranted in Mrs. Morgan's case.

### 1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The history and characteristics of Marian Morgan establish the appropriateness of a variance. She is a 57-year-old woman who suffers from notable health problems resulting from extensive pre-trial and pre-sentencing incarceration. Prior to this case, Mrs. Morgan had been a law-abiding citizen, as evidenced by her criminal history of 0. In addition, she has been married for over 13 years. A sentence imposed pursuant to a departure or variance will permit Mrs. Morgan to one day lead a productive and useful life and continue to rehabilitate herself.

As the Court is aware, the defendant has been incarcerated since her arrest by Sri Lankan authorities on August 13, 2009. She is currently in a single person cell in the Pinellas County jail, a county pre-trial detention facility, and has been incarcerated under those conditions for some time. She receives minimal recreation and, since her family is out of the country, few visits from them. During the years of her incarceration, she has developed significant health issues. She is currently being treated for heart, kidney, and skin problems, as well as glaucoma. The blood pressure medication she was prescribed while in jail has caused a severe reaction which has badly mottled her body, causing painful and itchy blisters and lesions from time to time. Prior to being incarcerated on these charges, Ms. Morgan had few health problems and was taking no

prescription drugs. Her continuous incarceration under these conditions has had a marked, deleterious, and permanent effect on her health and appearance.

The Eleventh Circuit recognizes that a district court may grant a downward departure where the accused has endured extreme conditions of incarceration or had unusual negative consequences affect her as a result of incarceration. *United States. v. Pressley*, 345 F.3d 1205, 1218 (11th Cir. 2003) (departure of two and one half years permissible where defendant had been confined for six years prior to trial); *United States v. Rodriguez*, 213 F.Supp.2d 1298, 1303, *amended*, 214 F.Supp.2d 1239, 1241 (M.D. Ala. 2002) (departure appropriate where defendant had been assaulted by guard while in jail); *cf. United States. v. Jayyousi*, 657 F.3d 1085, 1131 (11th Cir. 2011) (42% downward departure from bottom of guidelines, which was based mostly on deplorable conditions of pre-trial confinement, was unreasonable, although departure on this basis was permissible). *See also United States v. Brooks*, Case No. 07-CR-00187, 2008 WL 4693335 (E.D.N.Y. Oct. 23, 2008) (defendant who was confined to his cell for 10 months and had other restrictions granted departure from 37 to 31 months imprisonment.)

Although none of the above cited cases squarely address Mrs. Morgan's exact situation, the undisputed facts are that she will have been incarcerated for nearly three years by the time of her sentencing, all of it under much more severe conditions than she would have endured were she in a federal institution. Although she has not been physically attacked, these conditions have nonetheless had a serious adverse effect on her health and well-being, such that her health will never again be that which it was prior to her arrest.[1] A significant downward departure is appropriate for these reasons.

---

[1] Copies of medical records will be sent under separate cover to the Court, U.S. Probation, and the government, in addition to photographs of Marian Morgan with her family and letters from individuals close to Mrs. Morgan.

Related to this is Mrs. Morgan's eligibility for a downward departure due to her vulnerability to abuse in jail, and later in prison. In *Koon v. United States*, 518 U.S. 81, 111-12 (1996), the Supreme Court approved a downward departure to account for the defendant's susceptibility for abuse while in prison. Mr. Koon had been a Los Angeles policeman who was convicted of assaulting Rodney King. The district court, as affirmed by the Supreme Court, determined that Koon's status made him more vulnerable in prison and departed downward to reflect the more than usual onerous nature his incarceration. Other courts have followed this logic in granting departures on this basis. Mrs. Morgan is well into her fifties and while incarcerated, her case has generated no small amount of media attention. This profile has followed her to the jail where she has resided in a single person cell.

### 2.      The Need for the Sentence Imposed

*A-C.      to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;*

A particularly significant factor to be considered is the likelihood of Mrs. Morgan becoming a recidivist offender. The likelihood of recidivism by a 57-year-old woman with Mrs. Morgan's background is very low. Extensive research in the field of recidivism establishes an inverse relationship between the rate of recidivism and a defendant's age; the rate of recidivism decreases as the defendant's age increases. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 12 (May 2004) (excerpt attached hereto as Exhibit 1) ("Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates."). Mrs. Morgan is 57-years-old woman who has been married for 13 years. She has no criminal history or history of drug or alcohol abuse. Moreover, she has extensive higher

education, including a Bachelor's and Masters Degree. For all female offenders in Criminal History Category I, the recidivism rate is 10%. (Ex. 1, P. 28.) For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. (*Id.*) The positive correlation between age and recidivism is impossible to deny. Mrs. Morgan's advanced age, extensive higher education, and strong family support suggest recidivism is highly unlikely.

As noted, Mrs. Morgan has been incarcerated since August, 2009. A sentence imposing a lengthy term of incarceration is not necessary to affect any of the considerations identified in the Guidelines. Indeed, Exhibit 12 shows the least serious chances of recidivism are associated with offenders receiving probation or fines only. Courts routinely take the unlikelihood of a defendant's re-offending into account when fashioning sentences, as this Court should here. *See, e.g., United States v. Hamilton*, 2009 WL 995576, at \*3 (2d Cir. Apr. 19, 2009) (holding that the district court abused its discretion in not taking into account considerations with regard to age recidivism not included in Guidelines).

**D.       *to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;***

While this Court has the authority to depart downward based on Mrs. Morgan's medical condition pursuant to U.S.S.G. § 5H1.4, it can also grant a downward variance in light of Mrs. Morgan's health problems. *See United States v. Ryder*, 414 F.3d 908, 920 (8th Cir.2005) (recognizing a court's authority to consider a defendant's age and medical condition and to sentence under the Guidelines pursuant to § 3553). Section 3553(a)(2)(D) provides that a district court must consider a defendant's characteristics and the need to provide medical care in the most effective manner when sentencing a defendant. Effective treatment is largely dependent on quality of care, availability of treatment, and preventative care. The cost of healthcare is also a

significant factor to be considered in determining the most effective manner to address a defendant's medical care.

As discussed in depth in Section II, *supra*, Mrs. Morgan's extensive detention in a pre-trial facility has had a significant, adverse impact on her physical health. Prior to her arrest, Marian Morgan's only identifiable health issue was glaucoma, which she has been treated for since 2000. (PSR at ¶ 125). However, since being taken into custody, Mrs. Morgan has developed significant, sustaining health problems. Mrs. Morgan's deteriorating health condition should be taken into account for sentencing purposes.

### 3.   The Kinds of Sentences Available

A review of the potential Guideline range without any variance or downward departure shows Mrs. Morgan in Zone D, with an advisory Guideline range of lifetime imprisonment (level 43, criminal history category I). Mrs. Morgan's counts of conviction are Class C and D felonies. The PSR recommends a Guidelines sentence of 264 years' imprisonment (PSR at 140). However, as previously discussed, in light of Mrs. Morgan's 0 criminal history points, age, marital status, health, the facts of the case, and other factors, the Court  can determine what sentence is appropriate in Mrs. Morgan's case. The Court can impose a term of incarceration in combination with home detention, community service, supervised release, or all of these factors as a part of its sentence.

### 4-5.   The Kinds of Sentence and the Guideline Sentencing Range Established and any Pertinent Sentencing Commission Policy Statements

Although the impact of the guidelines on a court's sentencing discretion has been discussed in Section I, *supra*, the critical question in Mrs. Morgan's case is the exact weight this Court should give to the Guidelines. As recognized in *Gall*, district courts "may not presume that

the Guidelines range is reasonable." 552 U.S. at 49; *Rita*, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

Accordingly, this Court can take into account a number of factors in determining Mrs. Morgan's sentence, including the impact incarceration would have on Mrs. Morgan's health and her prolonged pre-trial and pre-sentencing confinement in county jail. These factors are completely ignored in the advisory Guideline range. Such an omission is troublesome when one considers that the Guidelines in Mrs. Morgan's case become the baseline for her sentencing. That is, any sentence imposed on Mrs. Morgan is seen in the context of how it compares with the applicable Guideline range.

### A.    *Adjustment for Injunctive Violation*

The PSR provides for the application of factually related sentence enhancements in Mrs. Morgan's case, including a two-level increase pursuant to § 2B1.1(b)(2)(B) for the offense involving violation of an injunction issued by U.S. District Court Judge Richard Lazzara in a related SEC case. (PSR at ¶ 96). The factual allegations in the PSR state that the Morgans failed to repatriate assets or provide an accounting of investor funds and other assets pursuant to the court's order, and that they continued to lull investors and claim that funds would be distributed in violation of the court's order. (*Id.*) This adjustment should not be applied to Mrs. Morgan as she never intentionally violated the Court's order.

As an initial matter, Marian Morgan was not required to produce any documents or provide an accounting as the government was on notice of Mrs. Morgan's invocation of her Fifth Amendment privilege. At Mrs. Morgan's trial, the Morgans' attorney, William Nortman of

Akerman Senterfitt, testified that he told the SEC lawyer that the Morgans would not be appearing to testify at the hearing. (Marian Morgan Trial Tr., Sept. 9, 2011, P. 20; Sept. 8, 2011, P. 262). Nortman's notice to the SEC lawyer put the government on notice of Mrs. Morgan's invocation of her Fifth Amendment privilege. *United States v. Doe,* 465 U.S. 605, 610–12, (1984) (emphasizing that the mere act of producing documents whose contents were not privileged could be sufficiently testimonial and incriminating in nature to trigger the fifth amendment privilege); *In re Grand Jury No. 86–3 (Will Roberts Corp.),* 816 F.2d 569, 571 (11th Cir.1987); *see also SEC v. Zimmerman,* 854 F.Supp. 896 (N.D. Ga. 1993) (discovery not compelled in securities fraud case in light of defendant's specific invocations of his Fifth Amendment privilege since it was likely that any response would lead to incriminating information for criminal case). Consequently, Mrs. Morgan was not required to produce documents or provide an accounting pursuant to the court's order.

Notwithstanding her Fifth Amendment privilege, Marian Morgan was in substantial compliance with the court's order as she took all actions reasonably attainable at the time of the order. Although the order required the Morgans to repatriate investor funds, any funds that may have been available at the time were not accessible by Mrs. Morgan. Moreover, an attorney for the SEC testified at trial that Akerman Senterfitt produced 41 separate documents pursuant to an SEC subpoena. (Marian Morgan Trial Tr. Sept. 8, 2011, P. 262-67; Sept. 9, 2011, P. 20-21).

The government has also asserted that the Morgans' intent to disobey the court order is evident by their failure to return to the States to appear as required for a hearing at the direction of the court. However, testimony elicited at trial demonstrates that Eli Heckscher told Mrs. Morgan she did not need to attend the hearing, and Mrs. Morgan's attorney informed SEC counsel that Marian Morgan would not be testifying at the hearing. (Marian Morgan Trial Tr.,

Sept. 8, 2011, P. 261-62; Sept. 9, 2011, P. 20-21).

For these reasons, the defendant's objection to the adjustment for violation of the court's injunction should be sustained and Mrs. Morgan's sentence should not be enhanced.

### B.     Adjustment for Abuse of a Position of Trust

The PSR and Addendum recommend a two level increase for abuse of trust. (PSR at ¶ 101). This enhancement should not be applied under the facts of the case and under the law of this Circuit.

To begin, the Eleventh Circuit has repeatedly cautioned that a sentencing court must be careful not to be "overly broad" in imposing the enhancement for abuse of trust, and that this enhancement is reserved for those situations where "the defendant is in a fiduciary, or other personal trust relationship to the victim of fraud, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010). This enhancement does not apply unless it is proven that the victim placed a "special trust" in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *United States v. Williams*, 527 F.3d 1235, 1250-51 (11th Cir. 2008). Also, this special relationship of trust must exist between the individual defendant and the victim, not a third party. *United States v. Louis*, 559 F.3d 1220, 1226 (11th Cir. 2009).

Independently, the law is clear that this enhancement does not apply where the underlying offenses are fraud offenses, as those underlying crimes already include "a component of misplaced trust inherent in the concept of fraud." *Williams*, 527 F.3d 1235; *United States v. Garrison*, 133 F.3d 831, 843 (11th Cir. 1998). As the crimes of conviction here include wire fraud, (Counts Two through Eight) and Transfer of Funds taken by Fraud (Counts Nine through

Thirteen), this element is already included in the base offense level and must not be recounted as an enhancement under § 3B1.1.

In investment fraud cases, our Circuit has repeatedly reversed the application of § 3B1.1 under circumstances such as those present here. In *United States v. Mullens*, 65 F.3d 1560 (11th Cir. 1995), the defendant portrayed himself as a financial advisor and head of Omni, a stock brokerage firm. Mullens convinced acquaintances to invest their life savings in Omni, where he had total control of the funds and accounts, and later used these funds for other purposes. Nonetheless, the Court reversed application of the enhancement, noting that "nothing in these circumstances (supported) the conclusion that a position of trust between Mullens and his victims was created." *Mullens*, 65 F.3d at 1566.

More recently, in *United States v. Morris*, 286 F.3d 1291 (11th Cir. 2002), the Court again overturned application of § 3B1.1 even though Morris portrayed himself as a lawyer and trader with complete control over investors funds. Morris had represented to his victims that he was a successful trader with prior experience and success doing international bank trades. He advised investors that their money would be placed into an attorney trust account where it would be safe. *Morris*, 286 F.3d at 1295-96. Indeed, money was wired to a trust account, but then wired out for Morris' own purposes. Nonetheless, the court observed that the inquiry is not whether Morris abused the victims' trust, but whether he held a position of trust that could trigger the enhancement under the Guidelines. The Court found that more than control and discretion is required under this enhancement; a fiduciary type relationship must be proven. As Morris did not stand in a fiduciary type posture with his victims, the enhancement was found to have been misapplied.

Here, the PSR and the court record note how alleged victims were brought in by intermediaries. Few, if any, of the "victims" knew Marian Morgan prior to investing. The process described at trial was for them to speak by telephone with John Morgan and then invest. (PSR at ¶¶ 22-23). Marian Morgan had nothing even remotely resembling fiduciary relationships with these individuals. That others may have had a closer relationship with the alleged victim is of no moment. This enhancement simply does not apply here.

Courts throughout the country have adopted the *Mullens* analysis of § 3B1.1. For example, in *United States v. Capplinger*, 339 F.3d 226, 237 (4th Cir. 2003), the defendant posed as a successful physician in order to get victims to invest in a cancer treatment drug. He made a series of false statements and provided false documents to induce investors and gain their trust, convincing them to invest in this bogus product. The Court reversed application of the enhancement, reasoning that the "trust" investors placed in Capplinger was their misplaced belief in his credentials and representations about the product. Finding no fiduciary type relationship, and following *Mullens*, the Court reversed the enhancement.

Likewise, in *United States v. Jolly*, 102 F.3d 46 (2d Cir. 1996), the Second Circuit found error in application of § 3B1.1 where the defendant defrauded investors by getting them to invest in a software company, but used the money for other, unrelated purposes. The Court observed that sales of shares, in the absence of a fiduciary relationship, do not create the type of trust needed to uphold this enhancement, and that the investors' trust was "simply their reliance on his (Jolly's) representations about Microtech's ongoing business and the appearance created by the repayments. Such reliance is the hope of every defendant who engages in fraud." *Jolly*, 102 F.3d at 49.

The defendant's objection to this enhancement should be sustained.

14

### C.    *Adjustment for Obstruction of Justice*

Application of the enhancement identified in paragraph 79 of the PSR operates to punish Mrs. Morgan for exercising her right to take the stand and testify in her own defense at trial. The government seeks a two-level enhancement pursuant to § 3C1.1 for obstruction on the part of Marian Morgan. As indicated in the PSR, the basis for the proposed adjustment is the defendant's provision of "extensive false testimony at trial." (PSR at ¶ 79).

Mrs. Morgan cannot, and should not, be penalized for asserting her constitutional right to testify through the imposition of an enhancement where she exercised her right to testify on her behalf, but was nevertheless found guilty. Section 3C1.1 does not automatically provide for an increase in a defendant's sentence where a defendant who testifies at trial is found guilty. Rather, an enhancement based on § 3C1.1 is appropriate where a court determines, based on an independent factual finding, that the defendant willfully gave perjured testimony concerning a material matter to support a finding of obstruction of justice. *United States v. Dunnigan*, 507 U.S. 87, 113 (1993); *United States v. Jones*, 32 F.3d 1512, 1519 (11th Cir. 1994).

A specific finding of perjury is required prior to application of this enhancement. *Dunnigan*, 507 U.S. at 113 ("[w]hen contested, the elements of perjury must be found by the district court"). In this context, perjury is defined as "false testimony concerning a *material* matter[2] with the *willful* intent to provide false testimony." *United States v. Singh*, 291 F.3d 756, 763 (11th Cir.2002) (internal quotation marks omitted) (emphasis added). As demonstrated by the terminology utilized by the Eleventh Circuit in *Singh*, the law clearly provides that the enhancement includes a willfulness requirement. *See also Dunnigan*, 507 U.S. 87. Indeed, some court limits the application of the Guidelines provision to only those cases where the government

---

[2] A "material matter" is one which is designed to affect the outcome of the case. U.S.S.G. § 3C1.1 comment. (n. 5); *Dunnigan*, 507 U.S. at 95, 113.

is able to prove, by a preponderance of evidence, that the defendant had a specific intent to obstruct justice." *See, e.g., United States v. Khedr,* 343 F.3d 96, 102 (2d Cir.2003) (internal quotation marks and citations omitted).

Thus, not every accused that testifies at trial and is later convicted is subject to an enhanced sentence for committing perjury. There are numerous reasons why the veracity of a defendant, as well as the credibility of her testimony, may be questionable. For example, a defendant may provide inaccurate testimony due to mistake, confusion, or faulty memory. U.S.S.G. § 3C1.1, comment. (n.2); *Jones,* 32 F.3d at 1519. Moreover, despite the provision of truthful testimony on the part of a defendant, a jury may nonetheless find the testimony insufficient to justify an acquittal or prove lack of intent.

Furthermore, a defendant may, of course, testify to matters vital to her defense at trial, including maintaining her lack of intent or culpability. *Dunnigan,* 507 U.S. at 95. The "defendant's denial of guilt...is not a basis for application" of § 3C1.1. *United States v. Willis,* 940 F.2d 1136, 1140 (8th Cir.1991) (citing U.S.S.G. § 3C1.1 n. 1); *see also United States v. Amos,* 952 F.2d 992, 994-95 (8th Cir. 1991), *abrogated on other grounds by United States v. Allery,* 175 F.3d 610 (8th Cir. 1999) (affirming district court's refusal to apply the enhancement pursuant to § 3C1.1 where the defendant's testimony at trial differed from his prior statement to law enforcement). "[I]n order to warrant a two-level enhancement for perjury, the perjury must be clear and a complete fabrication and not just a statement equivalent to 'I did not do it.'" *United States v. McKean,* 835 F. Supp. 227, 232 (M.D. Pa. 1993) (declining to depart upward for obstruction even though defendant more than likely committed perjury at trial because defendant's testimony constituted simple denial which did not impose additional burdens on the government). Additionally, not only must perjury of the defendant be clearly established, the

perjury of the defendant must be "supported by evidence *other than the jury's having disbelieved him.*" *United States v. McLaughlin,* 126 F.3d 130, 140 (3d Cir.1997) (emphasis in original) (quoting *United States v. Colletti,* 984 F.2d 1339, 1348 (3d Cir.1992), *abrogated on other grounds by United States v. Fiorelli,* 133 F.3d 218, 222–23 (3d Cir.1998)).

Due to the subjective nature of this analysis, in applying § 3C1.1, a defendant's "testimony or statements should be evaluated in the light most favorable to the defendant." U.S.S.G. § 3C1.1 comment. (n. 1). Courts have interpreted this as requiring the sentencing judge to resolve those disputes, about which she has no firm conviction, in favor of the defendant. *United States v. Hilliard,* 31 F.3d 1509, 1519 (10th Cir. 1994) (reversing district's court's finding of perjury for purposes of applying the obstruction adjustment). Mrs. Morgan's right to testify should not be undermined and punished through the enhancement of her sentence. *Singh,* 291 F.3d 756, 763 (11th Cir.2002).

### 6.      The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Prior to the promulgation of the Guidelines, disparity in sentencing was common. *Mistretta v. United States,* 488 U.S. 361, 365 (1989). The Guidelines were designed, in part, to remedy this disparity. "Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances." *United States v. Daas,* 198 F.3d 1167, 1180-81 (9th Cir. 1999).

Marian Morgan is the last of her co-conspirators to be sentenced, aside from Eli Heckscher, who has yet to be extradited from Denmark. Mrs. Morgan's three co-conspirators are central to the conspiracy in which Mrs. Morgan is charged. John Morgan, in particular, was a leader in the scheme to defraud the United States.

John Morgan, a principal of Morgan European Holdings ("MEH"), admitted to his role in conceiving and designing the international fraudulent scheme for which the Morgans and Mr. Bowman are charged. He recruited individuals to the enterprise, including team leaders or mid-level managers, and exercised authority over these individuals. (PSR at ¶ 70). He also solicited investors in the trading programs. (*Id.*) However, unlike Marian Morgan, John Morgan was identified as the President of MEH. *Morgan*, Case No. 8:09-cr-00585-SCB-TBM, Tran. of Sent. Hearing, P. 24 (Nov. 28, 2011).

John Morgan's primary role in relation to investors was solicitation and recruitment. (PSR Addendum at P. 3). In comparison, Mrs. Morgan's interaction with MEH investors was overwhelmingly limited to communications that occurred following their contact with Mr. Morgan, and subsequent to their agreement to invest funds in the programs—a process which Mr. Morgan oversaw. (*Id.*) Subsequent to Mr. Morgan's recruitment of an investor, Marian Morgan would communicate with the investors, acting predominantly as a middleman to facilitate communication and logistics. (*Id.*)

John Morgan plead guilty to Counts One (conspiracy to defraud the United States) and Sixteen (money laundering) of the Indictment charging the Morgans. *United States v. John Morgan*, 8:09-cr-585-SCB-TBM, Doc. 337 (M.D. Fla. Nov. 28, 2011). Mr. Morgan was sentenced to 121 months' imprisonment, three years' supervised release, a sentence at the bottom of the Guidelines range of 121-155 months. *Id.* In addition, he was ordered to pay $17,360,850 in restitution. *Id.* The sentence was premised on his willingness to testify against Marian Morgan, his attempts to persuade Mrs. Morgan to plead guilty, his waiver of attorney-client privilege so his attorney could testify at Mrs. Morgan's trial, and the affidavit and letters he drafted at the

government's request. *John Morgan*, Case No. 8:09-cr-00585-SCB-TBM, Tran. of Sent. Hearing, (Nov. 28, 2011).

The second co-conspirator, Stephen Bowman, pleaded guilty to one count of conspiracy to defraud the United States and one count for transfer of funds taken by fraud, two of the offenses for which Mrs. Morgan was convicted. *United States v. Stephen Bowman*, Case No. 8:09-cr-00585-SCB-TBM, Doc. 387 (M.D. Fla. Jan. 23, 2012). Stephen Bowman was the former principal of Bowman Marketing Group, Inc. ("BMG"), a business purportedly involved in assisting companies with marketing and raising capital, in addition to offering and selling investment opportunities and program. (PSR at ¶ 71). Mr. Bowman directly solicited investors to the MEH programs, collecting proceeds from investors through BMG for the MEH trading programs. (*Id.*) Mr. Bowman's involvement with investor funds exceeded that of Marian Morgan, as evidenced by his diversion of a (minimum) of $850,000 for his own personal use. *Bowman*, Case No. 8:09-cr-00585-SCB-TBM, Tran. of Sent. Hearing (Nov. 28, 2011). Mr. Bowman diverted these investor funds, which investors intended to go to MEH, to his own accounts, all without Mrs. Morgan's knowledge or acquiescence. *Id.*

On November 28, 2011, this Court sentenced Mr. Bowman to 51 months' imprisonment and 36 months' supervised release, constituting a sentence at the low end of the Guidelines. *Bowman*, Case No. 8:09-cr-00585-SCB-TBM, Doc. 387. In January 2012, during a separate hearing on the issue of restitution, Mr. Bowman was ordered to pay $6,251,483.66 in restitution. *Id.* The primary reason for Mr. Bowman's sentence was his substantial assistance he provided to the government, including his admission of his role in the offense, compliance with requests for production on the part of the SEC, and explanation of illegal conduct of himself and others

19

through numerous interviews, including a debriefing on the conduct of Mr. Heckscher. *Bowman*, Case No. 8:09-cr-00585-SCB-TBM, Tran. of Sent. Hearing (Nov. 28, 2011).

Eli Heckscher, the remaining co-conspirator in the conspiracy in which Mrs. Morgan was charged, has not been extradited from Denmark. The PSR and court records reveal that Mr. Heckscher was a Danish attorney who played a central role in the events involving the Morgans and Mr. Bowman. (PSR at ¶ 72). Eli Heckscher participated by maintaining various overseas bank and escrow accounts, accrediting the MEH trading programs, and communicating with investors on a regular basis. (*Id.*) Additionally, Mr. Eli Heckscher drafted and executed various contracts and legal documents with investors. (*Id.*)

Despite the prominent role of her co-conspirators, the PSR scores four additional points for the defendant's role in the offense. (PSR at ¶ 99). The enhancement is based on the joint efforts of John and Marian in the charged crime. (*Id.*) The Addendum repeats this theme. As this Court will recall, the government stipulated at John Morgan's sentencing that the appropriate role adjustment for Mr. Morgan was three levels. *John Morgan*, Case No. 8:09-cr-00585-SCB-TBM, Tran. of Sent. Hearing, P. 12 (Nov. 28, 2011). The Addendum recognizes this apparent inconsistent position and suggests that this discrepancy be addressed through a variance.

Nonetheless, the factual predicate for this enhancement requires the government prove the defendant was the leader or organizer of a criminal enterprise and supervised more than five other criminal participants. The PSR does not name these other individuals, and notes there were an unknown number. (*Id.*) Of course, co-participants holding an organizational role equal or greater to that of the defendant are not included in this calculation U.S.S.G. § 3B1.1, comment. (n.2). Therefore, John Morgan who is described as an equal co-participant, is not included. The same is said for Eli Heckscher.

That leaves Stephen Bowman, who as the Court is aware, collected $12,482,415.59 from investors through his own company, BMG, but remitted only a portion of those funds to MEH. *Bowman*, Case No. 8:09-cr-00585-SCB-TBM, Tran.of Sent. Hearing (Nov. 28, 2011). Mr. Bowman, acting entirely independent from the defendant, diverted a minimum of $850,000 of BMG proceeds to his own use. *Id.* It cannot be said that Mr. Bowman was supervised by Marian Morgan. If anything, he utilized the names of the Morgans to induce Bowman investors to invest with Mr. Bowman as opposed to the Morgans. There are no other criminally responsible individuals named or that have been proven. This enhancement should be stricken.

A sentence imposing the suggested term of incarceration, and applying a four-level enhance for her role in the criminal enterprise, would result in disparate sentencing and would fail to recognize and distinguish the leadership roles of Messrs. Morgan, Bowman, and Heckscher in the conspiracy from Mrs. Morgan's role. Unlike her co-conspirators, Mrs. Morgan faces a Guidelines recommendation of life imprisonment. Adopting the PSR's recommendation of 246 years' imprisonment renders Mrs. Morgan's role in the conspiracy to be nearly 25 times as significant as Mr. Morgan, and over 61 times more important to that of Mr. Bowman. However, as set forth above, Marian Morgan's role and conduct in the offense in no way equates to more culpability than those of her counterparts. For these reasons, and in the interests of justice, Mrs. Morgan should receive a downward departure or variance.

An appropriate resource to consider on the issue of sentencing disparity is the *U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3d Quarter Release Through June 30, 2011, an excerpt of which is attached hereto as Exhibit 2. In this publication, sentences from around the country are compared and different variables noted. The need for a sentence of incarceration under the instant facts can be evaluated by comparing how similar cases have been

21

treated in this circuit and nationally.

Table 1 reveals that of all sentences, 54.3% have been within the Guidelines. Forty-four percent of imposed sentences are below Guidelines, with 17.2% of these below Guidelines sentences being for reasons other than cooperation with the government, and 26.8% were government sponsored.

Table 2, page 7, indicates that 23.9% of sentences imposed in the Middle District of Florida are below Guidelines based on *Booker*, and 16.1% are below Guidelines as a result of substantial assistance, meaning over 40% of all sentences imposed in the Middle District of Florida are at below Guidelines levels. Moreover, as Table 5, page 13 indicates, approximately half of all sentences imposed nationwide under the applicable Guideline, § 2B1.1, are sentenced in accordance with the Guidelines.

The upshot of all this is that courts around the country have granted variances and departures in this type of case, and this Court should do so also. For example, in October, 2010, U.S. District Court Judge John Koeltl imposed a sentence of 14 years' prison in the case of convicted Sarasota Ponzi schemer Arthur Nadel, nicknamed "Mini Madoff." Nadel's guilty plea followed his indictment for 15 counts, including six counts of securities fraud, eight counts of wire fraud, and one count of mail fraud for his role as manager of the a major hedge fund. The expansive fraudulent scheme, noted as the largest financial swindle in the history of southwest Florida, resulted in $162 million in loss from nearly 400 victims over a period of several years.

Two months later, in December 2010, U.S. District Court Judge James Moody sentenced defendant Beau Diamond to 15 and a half years in prison for his role in running a fraudulent and

sophisticated Ponzi scheme involving foreign currently trading club.[3] Diamond's scheme involved 193 victims, nearly four times the amount of victims identified in this case. Diamond garnered approximately $37 million in fraudulently obtained Ponzi proceeds, nearly double the amount at issue in Mrs. Morgan's case.

Even former WorldCom boss Bernard Ebbers received a sentence less than that recommended by the government in this case for his role in overseeing the company's $11 billion fraud. In July 2005, a federal judge sentenced Ebbers to 25 years in prison in the wake of several other prominent sentencings involving corporate business executives, including Jamie Olis of Dynegy, Inc. (24 years), John Rigas of Adelphia Communications Corp. (15 years), and Timothy Rigas, also of Adelphia Communications Corp. (20 years).

In January 2012, U.S. District Court Judge Charlene Honeywell sentenced David Merrick, former president of Traders International Return Network ("TIRN"), for his role in a fraudulent investment scheme carried out through the company. Beginning in May 2008, TIRN collected in excess of $15 million from more than 500 investors nationwide. Merrick and his co-conspirators misappropriated the funds, which were intended to be invested in the FOREX market, the buying and selling of commodities, the purchase of gold mines, and real estate investments. Merrick was sentenced to over eight years for his role in the conspiracy and ordered to pay over $11.4 million in restitution. The judgment also included a forfeiture of more than $9.6 million in assets and a money judgment in the amount of $15 million.

More recently, in March 2012, the U.S. Attorney for the Middle District of Florida

---

[3] Note that the court declined to apply an abuse of trust enhancement in Diamond's case, as requested by the government, despite the fact that many of Diamond's investors did business with him because they trusted his father, Harvey Diamond, co-author of a best-selling diet book. In declining to apply the enhancement, the court recognized that all investments require some level of trust on the part of the client and investor.

23

announced that Jerry Williams, former President of Orion Bank, pleaded guilty to conspiracy to commit bank fraud and making false statements to federal regulators. Although Williams is awaiting sentencing, the maximum prison sentence for his role in the multi-million dollar bank scheme is 15 years in prison. Williams' co-conspirators, including the bank's former Executive Vice President, Senior Vice President, and former bank borrower were sentenced to 2.5 years, two years, and 5.5 years, respectively, for their participation in the conspiracy. Additionally, the former Executive Vice President was ordered to pay over $33.5 million in restitution, while the remaining defendants were ordered to pay restitution in the amount of $65.2 million.

Last month, in *United States v. Joseph Troiano*, U.S. District Court Judge John Steele sentenced Joseph Troiano, a former attorney, for his role in a fraudulent scheme perpetuated in south Florida over a five year period. Troiano used funds belonging to his clients, their beneficiaries, or others to perpetuate a Ponzi scheme involving purported real estate investments. Troiano used client funds without his clients' authority or consent, misappropriating a minimum of $2.4 million for his own use. Judge Steele imposed a six year sentence and ordered Troiano to pay restitution in the amount of approximately $2.5 million.

It would simply be unfair to punish Mrs. Morgan with a sentence harsher than similarly situated individuals and, indeed, individuals involved in much larger fraudulent schemes. For these reasons, the defendant respectfully submits that a downward departure or variance is appropriate in this case.

## CONCLUSION

Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, undersigned counsel respectfully

submits that a sentence below the applicable and advisory Guideline range is appropriate in Mrs. Morgan's case.

Dated:  April 24, 2012

Respectfully submitted,

BARRY A. COHEN
Florida Bar No. 96478
**COHEN & FOSTER, P.A.**
201 East Kennedy Boulevard, Suite 1000
Tampa, Florida  33602
Telephone:  (813) 225-1655
Facsimile:  (813) 225-1921
bcohen@tampalawfirm.com
*Counsel for Defendant Marian I. Morgan*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing with the Clerk of United States District Court, using the CM/ECF System on this 24th day of April, 2012, which will send electronic notice to **Cherie L. Krigsman, AUSA.**

BARRY A. COHEN