UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:09-cr-585-TPB-TBM

MARIAN MORGAN

**UNITED STATES' RESPONSE IN OPPOSITION TO MARIAN MORGAN'S THIRD MOTION FOR COMPASSIONATE RELEASE**

The United States opposes inmate Marian Morgan's third motion for compassionate release. Doc. 513. Morgan has not presented sufficient proof of any medical conditions or other circumstances that are extraordinary and compelling, and, in any event, she represents a danger to the community, and the 18 U.S.C. § 3553(a) factors do not support her early release from incarceration.

## I. Background

In 2012-- after a 17-day trial and guilty verdicts on all 22 counts of the indictment--this Court sentenced Morgan to serve 420 months' imprisonment. Docs. 300, 427. Morgan also was ordered to pay nearly $20 million in restitution to the victims and the IRS. Doc. 457 at 6. Morgan appealed her conviction and sentence. The Eleventh Circuit affirmed her conviction but vacated her sentence after finding that a two-level enhancement for abuse of a position of trust was improper. In December 2013, Morgan was resentenced to 405 months' imprisonment. Doc. 457.

The charges against Morgan and her several coconspirators were based on a fraudulent investment scheme. In 2005, Morgan and her husband formed a company to promote their fraudulent "no-risk" investments. *See* Doc. 350 at 128-35; Doc. 354 at 14-15; Doc. 357 at 249-51; Doc. 359 at 26-29. Morgan handled all the paperwork and wire transfers, and she maintained ongoing contact with the victim-investors. Gov't Trial Exs. 405-A-B, 405Q-I, 408, 409, 419, 260C; *see* Doc. 351 at 15; Doc. 355 at 64; Doc. 356 at 140. The trial judge described Morgan as controlling "all aspects of the scheme." *See* Doc. 510 at 12. When the scheme began to unravel, Morgan attempted to limit the collateral damage by warning the victim-investors that, if they complained to the authorities, their investments likely would be frozen—and ultimately lost—in the ensuing litigation. *See, e.g.,* Doc. 356 at 142–44, 148–49; Gov't Tr. Exs. 260D, 260K.

The investigation of the scheme uncovered no evidence that the Morgans' company had engaged in any legitimate business. Doc. 355 at 62–63; Doc. 359 at 122–23, 182–84. Moreover, during trial, an expert in international banking operations and commercial fraud explained that the Morgans' investment scheme was very similar to other fraudulent "Ponzi" type schemes he had analyzed over the years. Doc. 359 at 202–09, 213–16, 225–26, 232–40; Doc. 360 at 5–37, 50–59, 132.

Morgan and her husband regularly used investor funds for personal expenses like restaurant tabs, hotel bills, furniture, clothing and accessories, boat storage and maintenance fees, their home mortgages (which eventually totaled almost $60,000

per month), and even their federal income taxes. Doc. 357 at 259–64; Doc. 359 at 46–51, 63–66, 72–76, 86–100, 107–10. They also purchased or leased several luxury automobiles and a boat while operating the MEH scheme. Doc. 351 at 79–84, 88–90, 99; Doc. 352 at 154–58, 179–80; Doc. 354 at 105–06; Doc. 361 at 31–35; Doc. 362 at 280–81; *see* Gov't Tr. Exs. 35H, 40A, 40B, 41A, 41B. And they purchased a Sarasota home and lot for more than $7 million. Doc. 352 at 111–41, 146; Doc. 361 at 43–46. Investor funds also were transferred to Morgan's sister, mother, and aunt. Doc. 357 at 281; Doc. 359 at 59, 109–10; Doc. 362 at 182–83. All told, the Morgans received about $11 million from the scheme. Doc. 359 at 111–13; Doc. 367 at 7.

The Morgans were arrested in Sri Lanka in August 2009 for (among other things) passing forged financial instruments in that country. Doc. 351 at 243–44, 252; Doc. 354 at 22–23, 74–76, 222. Soon thereafter, the United States charged them by complaint with wire fraud. Doc. 1. When Sri Lankan authorities decided to remove the Morgans from the country, federal agents traveled there and returned them to the United States, where they were taken into custody. Doc. 354 at 25–26, 28–35, 164.

Morgan testified extensively at trial. Doc. 360 at 155–287; Doc. 361 at 12–280; Doc. 362 at 6–311; Doc. 366 at 13–146. She freely admitted her involvement in the investment scheme but vehemently maintained that the investments had been legitimate. *See, e.g.,* Doc. 360 at 207–23, 237–87; Doc. 361 at 13–18, 41–43, 104–05, 125–27, 134–36, 144–45, 248; Doc. 362 at 210; Doc. 366 at 39. She also denied ever

knowing that investor funds had been misappropriated to support the Morgans' lavish lifestyle, and--wholly ignoring evidence to the contrary--she repeatedly asserted that the funds she and her husband had used had been the proceeds of prior, successful business transactions. Doc. 361 at 118–20, 166–67; Doc. 362 at 109–13, 150, 202, 231, 237, 273–74, 292–94.

On cross-examination, Morgan acknowledged that she had played an operative role in the scheme, that she had regularly communicated with the investors during the course of the scheme, and that she had often directed the flow of investor funds to the Morgans' personal and business accounts. Doc. 362 at 104–09, 111, 116, 123, 127–28, 145, 228.

In May 2020, Morgan filed her first compassionate release motion based on COVID concerns, claiming that she was at increased risk for severe illness from COVID-19 because she was a senior citizen (then 65 years old) with chronic health conditions. Doc. 489. The United States responded, Doc. 493, and the Court denied the motion, first because she had not exhausted her administrative remedies, as required. Doc. 499 at 4-6. But, the Court continued, even if Morgan had exhausted those remedies, she nevertheless had failed to demonstrate that her various medical conditions, her age, or any other reason, constituted an extraordinary and compelling reason warranting relief. *Id*. at 8-11. The Court also noted that Morgan had failed to substantiate her health-related claims with medical records. *Id*. at 8-9.

In March 2021, Morgan filed her second motion for compassionate release.

Doc. 500. She asserted that she had exhausted administrative remedies and that her age and medical conditions[1] made her especially vulnerable to contracting COVID 19. *Id*. at 3-10. The United States responded, Doc. 506, and the Court denied Morgan relief, Doc. 510. The Court again found that Morgan had not complied with the exhaustion requirement. *Id*. at 6-7. Then, the Court also held that Morgan had failed to demonstrate an extraordinary and compelling reason warranting a sentence reduction. *Id*. at 7. What's more, the Court held that, even if Morgan had exhausted her administrative remedies and was eligible for compassionate release, the 18 U.S.C. § 3553(a) factors weighed against release. Doc. 510 at 11-12

Morgan is incarcerated at FCI Marianna in Marianna, Florida. She is 69 years old and is projected to be released on June 14, 2037. *See* BOP Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on March 5, 2024). Morgan has served approximately 14.5 years' imprisonment. She has served approximately 42.7% of her full term of imprisonment and 50% of her statutory term. *See* Doc. 513-1 at 40.

## II. Memorandum of law

A district court has no inherent authority to modify a sentence; it may do so "only when authorized by a statute or rule." *United States v. Puentes*, 803 F.3d 597,

[1] Morgan specifically recited the following conditions in her motion: hyperlipidemia, hypertension, chronic kidney disease, lichen planus (skin condition), thyroid disorder, sinusitis, and Legionnaires, but she focused her argument on hypertension and rhinitis/sinusitis. Doc. 500 at 3-8.

606 (11th Cir. 2015). One of those statutes is 18 U.S.C. § 3582(c)(1)(A), which permits a court to reduce a term of imprisonment if the court determines that (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) the § 3553(a) sentencing factors weigh in favor of a reduction. *Id.*; *see also United States v. Tinker*, 14 F.4th 1234, 1237 (11th Cir. 2021).

The Sentencing Commission's applicable policy statement, set forth in USSG §1B1.13, defines "extraordinary and compelling reasons" for purposes of section 3582(c)(1)(A), and it is binding on the courts. *United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021). Under section 1B1.13, "extraordinary and compelling reasons" that may render a defendant eligible for a sentence reduction fit in the following categories relevant to Morgan's motion: (1) medical circumstances of the defendant; (2) advanced age plus length of term already served; and (3) family circumstances that result in the defendant being the only available caregiver for a minor or incapacitated immediate family member. USSG §1B1.13(b)(1)–(3).

If the court finds that an extraordinary and compelling reason exists, it still may not reduce the defendant's term of imprisonment under section 3582(c)(1)(A) unless it also finds that the defendant's release would not endanger the community and that the factors listed in 18 U.S.C. § 3553(a) favor compassionate release. *Tinker*, 14 F.4th at 1237. If the defendant fails to establish any of the three requirements, the court need not analyze the other requirements and cannot grant

relief. *See United States v. Giron*, 15 F.4th 1343, 1348 (11th Cir. 2021).

The defendant, as movant, bears the burden of establishing entitlement to relief under section 3582. *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014) (addressing a motion for reduction of sentence under 18 U.S.C. § 3582(c)(2)). And the defendant must first "fully exhaust all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See United States v. Harris*, 989 F.3d 908, 909–10 (11th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). The exhaustion requirement is "mandatory, in the sense that a court must enforce the rule if a party properly raises it." *Harris*, 989 F.3d at 911 (internal quotation marks omitted).

## III. Morgan's compassionate release motion

### A. Exhaustion

Morgan submitted her request for a sentence reduction to the Warden on December 6, 2023, and the Warden issued a denial on December 21, 2023. *See* Doc. 513-1 at 2, 4. More than 30 days passed from the BOP's receipt of Morgan's original application before she filed her motion in this Court, so this Court may consider the merits of Morgan's motion.

### B. Extraordinary and compelling circumstances

Here, Morgan requests a reduction of her sentence based on three grounds: her medical condition, her age, and her family circumstances. Doc. 513 at 3. Section

1B1.13(b) permits a reduction of a defendant's sentence based on each of these grounds if certain criteria are satisfied.

1. Medical Circumstances

Section 1B1.13(b) provides that a reduction may be appropriate, under 1B1.13(b)(1)(B)-(D)[2] if the defendant is:

> (i) suffering from a serious physical or medical condition,
>
> (ii) suffering from a serious functional or cognitive impairment, or
>
> (iii) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
> (D) The defendant presents the following circumstances—
>
> (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>
> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>
> (iii) such risk cannot be adequately mitigated in a timely manner.

[2] Section 1B1.13(b)(1)(A) is not relevant to Morgan's motion because she does not claim that she is suffering from a terminal illness.

Morgan claims that "all" of her chronic conditions (hyperlipidimia, glaucoma, lichen planus, polyneuropathy, acute sinusitis, cataract, hypertension, renal stenosis, cervicalgia, lumbar injury, Stage 3a chronic kidney disease) are "debilitating" and "require constant observation" and follow-up care. Doc. 513 at 2-3. But her medical records do not support those assertions. Indeed, her own description of her medical conditions undermine her claim. For example, she states that Stage 3a kidney disease—which appears on its face to be the most serious of her medical conditions--means that there is "mild to moderate loss of kidney function." Doc. 513 at 3. Although she argues that there is an increased risk that the kidney disease may get worse and pose a risk for heart disease, she does not supply any evidence for this assertion, nor does she demonstrate that her current condition substantially diminishes her ability to provide selfcare within the environment of a correctional facility.

To the contrary, recent medical records obtained from FPC Marianna show that on February 21, 2024, Morgan was seen by medical professionals at "Nephrology Associates" in Panama City for her renal conditions and was assessed to have "Chronic kidney disease, stage 2, mild."[3] Gov't Ex. 1 (under seal) at 1.[4] Laboratory

[3] A note in Morgan's medical records from the correctional facility indicates that medical personnel at the facility had assessed her as having Stage 3a kidney disease. Her urine creatine level as tested on December 28, 2023, was slightly below normal, designated as "Low" but not "Low Critical" (27.8 mg/dl, with a normal range of 29.0-226.0). *See* Doc. 513-1 at 37.

[4] The United States has submitted only a portion of Morgan's voluminous medical records (approximately 300 pages) that are relevant to her claims and not redundant of the records she has already submitted. The United States can provide the complete set of records should the Court desire.

tests were to be ordered *and she was advised to come back in six months*. *Id*. at 3.

Morgan also claims in her motion that a neurosurgeon told her "recently" that she risks "paralysis" if she does not immediately have a "cervical disectomy and fusion surgery." *See* Doc. 513 at 2. She does not cite any medical records or provide any details regarding this admonition. Her medical records do, however, show that on December 5, 2023, she had an MRI performed on her cervical spine, which showed "likely cord compression" and "spondolylosis" in C5-C7. Gov't Ex. 1 at 18-19. She subsequently saw a neurosurgeon on December 22, 2023, *see id*. at 11, and on January 3, 2024, she saw a Dr. Kettunen, who consulted with her regarding orthopedic surgery, *see id*. at 7. Her next appointment for consultation regarding the surgery was scheduled for March 3, 2024. *Id*.

Although Morgan's kidney disease may be a serious condition that needs to be monitored, and she may require surgery for cervical spine issues, Morgan has not shown that these conditions, or any combination of her conditions, are so debilitating as to diminish her ability to provide selfcare within the facility. She therefore has not shown an "extraordinary and compelling reason" for compassionate release. *See, e.g., United States v. Clark,* 2019 WL 1052020, at *3 (W.D.N.C. Mar. 5, 2019) (defendant suffered from declining health, diabetes, kidney failure, and back problems requiring a walker; court held that, even assuming that defendant suffered from a serious physical or medical condition or deteriorating physical health due to age, she did not meet the "extraordinary and compelling"

standard because she had not demonstrated that her conditions substantially diminished her ability to provide self-care within the corrections environment); *United States v. Goode*, 2020 WL 58272 (S.D.N.Y. Jan. 6, 2020) (while inmate's kidney disease was incurable, and she received dialysis, her disease was treatable, she responded well to that treatment, and she did not have an "end of life trajectory."); *United States v. Dusenbery*, 2019 WL 6111418 (N.D. Ohio Nov. 18, 2019) (defendant did not have "exceptionally severe" condition that justified release; his kidney ailment (which could cause his kidneys to fail within 5-10 years), as well as "hypertension, cataracts, dental issues, actinic keratosis, allergic rhinitis, nasal polyps, hemorrhoids, acute periodontitis, nuclear sclerosis and viral warts," did not impair his ability to provide selfcare within the facility); *Cannon v. United States*, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (71-year-old defendant suffered from significant back and stomach issues, as well as high blood pressure, diabetes, skin irritation, loss of hearing, and various other complications, but relief denied because there was no indication that he was terminally ill, and he did not provide evidence that his conditions/impairments prevented him from providing self-care within his correctional facility. Rather, the records he provided showed that his conditions were being controlled with medication, and there was no evidence that his conditions were escalating or preventing him from being from being able to provide self-care."); *United States v. Bunnell*, 2019 WL 6114599 (D. Ariz. Nov. 18, 2019) (although defendant had "serious medical issues" and suffered from "arthritis, sciatica, bulging

lumbar discs 2-5, scoliosis, and degenerative disease causing central stenosis in his spine," and was confined to a wheelchair, none of these conditions were terminal illnesses or substantially diminished his ability to provide selfcare within the facility).

Moreover, Morgan has not shown that Marianna FPC cannot adequately deal with her medical conditions. Rather, her medical records are replete with examples of her visits to seek medical treatment, including specialized care for her kidneys and cervical spine issues. *See* Doc. 513-1 at 19-37, Gov't Ex. 1.

Finally, as discussed more fully below, Morgan's claim of severe medical conditions undermines her contention that she should be released to take care of an elderly, sick relative—which would involve countless daily actions requiring physical exertion.

Because Morgan has not demonstrated that (1) she suffers from a serious medical condition that that substantially diminishes her ability to provide selfcare within the environment of a correctional facility, or (2) that she is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death, she has not established extraordinary and compelling grounds for compassionate release based on medical conditions.[5]

---

[5] Morgan also mentions that the conditions of her imprisonment constitute extraordinary and compelling reasons for sentence modification because she contracted the COVID-19 virus and "Legionaires" at Coleman. Doc. 513 at 3. She has not shown any lasting, serious manifestations or consequences of either of these conditions. Moreover, as the Court noted in denying Morgan's second motion for compassionate release, Morgan was "essentially asymptomatic" when she contracted COVID-19. Doc. 510 at 10.

2. The Age of the Defendant

Morgan next seeks release based on her age—69, almost 70. Section 1B1.13(b)(2) provides that extraordinary and compelling circumstances may exist if the defendant is

> (A) is at least 65 years old;
>
> (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and
>
> (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

Morgan satisfies the first and third elements of this standard, but she nevertheless has not shown that she is experiencing a serious deterioration in physical or mental health because of the aging process, as discussed above. *See United States v. Holley*, 2021 WL 2320394, at *5-6 (N.D. Ala. June 7, 2021) (collecting cases) (ordinary geriatric ailments of 75-year-old who had served 22 years of life sentence did not justify relief; his "conditions, while numerous, are generally benign, stable, well-managed, and do not cause a major adverse effect on his quality of life"; this stands in contrast to other cases where courts have granted relief based on a rapid decline in health, or where inmates needed constant care, required constant medical aids like a walker or oxygen, or required frequent hospitalizations or serious medical treatments). As Morgan's medical records show, although she does suffer from several medical conditions, they are not so far outside the realm of ordinary geriatric ailments for a 69-year-old woman to warrant "extraordinary and

compelling circumstances." And, in any event, they are relatively stable and well-managed in the facility at this time.

3. Family Circumstances of the Defendant.

Section 1B1.13(b)(3) provides that certain family circumstances may constitute extraordinary and compelling reasons warranting compassionate release. Morgan seeks relief under Section 1B1.13(b)(3)(D), which provides that the requisite family circumstances may be shown when the defendant establishes that she is the only available caregiver for "an individual whose relationship with the defendant is similar in kind to that of an immediate family member" and that individual is incapacitated.

Morgan claims that she is the "primary caregiver" for her 94-year-old aunt, Alice Abel. Morgan submitted a letter from Ms. Abel's doctor, Mark H. Brus, M.D., who describes Ms. Abel as having "developed progressive difficulties in performing activities of daily living." Doc. 513-1 at 1. Dr. Brus states that Ms. Abel has fallen twice, and that he has been asked by Ms. Abel's family to draft the note in support of Morgan's request for compassionate release. *Id*. Dr. Brus, however, also states that Ms. Abel has a sister who lives in Canada (presumably Morgan's mother), and a niece who lives in Barbados (presumably Morgan's sister). Dr. Brus makes no mention of Mr. Morgan, nor does he explain who currently takes care of Ms. Abel.

Morgan's argument here requires unpacking. First, her claim that she is the "primary caregiver" for Ms. Abel cannot be true, because Morgan has been

incarcerated in the United States since December 2009. Before that, she was incarcerated for several months in Sri Lanka (where she and Mr. Morgan fled after Judge Lazzara issued a temporary restraining order and froze their accounts as part of a related SEC action, *see* Doc. 191 at 3-4, 9-10; Doc. 315 at 2). So, to the extent that Morgan was ever Ms. Abel's primary caregiver, she has not filled that role for at least the past 15 years.

Second, Morgan does not explain why Ms. Abel's surviving relatives cannot provide care or facilitate/arrange care for her. Morgan's younger sister, who lives in Barbados, Lilian Chatterjee, currently serves as Canada's High Commissioner for Barbados. See https://www.international.gc.ca/country-pays/barbados-barbade/bridgetown-rep.aspx?lang=eng. As Canada's High Commissioner, Ms. Chatterjee "oversees a team of 47 diplomatic and locally-engaged staff, serving 7 sovereign nations." *Id.* Ms. Chatterjee has served at high levels of the Canadian government for over 20 years. *See id.*, PSR April 12, 2012, at ¶ 117. Ms. Chatterjee appears to possess both the executive-functioning skills and financial means to assist in providing caregiver services for Ms. Abel. Indeed, testimony and financial records at Morgan's trial established that the Morgans had sent Ms. Chatterjee over $458,000 of the investor funds that they had fraudulently obtained from their victims. Doc. 357 at 281; Doc. 359 at 109-110. Trial testimony further established that the Morgans had sent $50,350 of investor funds to Ms. Abel herself. *Id*. Finally, according to her PSR, Morgan has another sister, Jillian (Gillian) Chatterjee Beg,

who lives in Canada and was employed in "home health care." PSR at ¶ 116. As of April 2022, Ms. Beg had posted photos on a public-facing Facebook site.

Although neither of Morgan's sisters lives in Florida, Morgan has not shown why she is the only available caregiver for Ms. Abel. She states that her husband works full time and cannot afford care for Ms. Abel,[6] but she has not demonstrated why Ms. Abel's surviving relatives cannot assist Mr. Morgan by underwriting or arranging a caregiver to stay with Ms. Abel while Mr. Morgan works. And, finally as mentioned above, if Morgan's medical conditions are so severe as to warrant compassionate release, it seems unlikely that she could provide the hands-on care for Ms. Abel.

For all these reasons, Morgan has not met her burden of showing extraordinary and compelling family circumstances. *See United States v. Rooks,* 2022 WL 267899, at *6 (E.D. Pa. Jan. 28, 2022) (defendant failed to show that he was only available caregiver for his child; to prevail on such a claim, "a defendant typically must establish that all other potential caregivers for their minor child are incapacitated. . . . To prove incapacitation, a defendant must establish a person is 'completely disabled' or unable to 'carry on any self-care and [are] totally confined to a chair or bed.' . . . Moreover, it is not enough to show a potential caregiver is merely 'inconvenienced' by the childcare or 'somewhat sick.'") (citations omitted);

[6] Morgan also does not explain who cared for Ms. Abel when her husband was incarcerated. In November 2011, he was sentenced to 121 months' imprisonment. Docs. 337, 449.

*United States v. Burden,* 2024 WL 94402, at *3, (D. Conn. Jan. 8, 2024) (defendant was not only possible caregiver for elderly parents because his sister and nephew had provided extraordinary care; although they worked and had other obligations--as do many relatives or elderly persons—court held that they could obtain caregivers.)

**C. Danger to the community**

Even if this Court finds that Morgan has established extraordinary and compelling circumstances within the meaning of section 1B1.13, it still should not reduce her sentence because she remains a danger to the community. In 2021, the Court denied Morgan's second motion for compassionate release, explaining:

> During the three days in which she testified on her own behalf at trial, Morgan lied repeatedly. Her numerous offenses involved over 80 victims who sustained over $17.5 million in actual loss, as well as a loss of over $2 million to the Internal Revenue Service. While Morgan purports to accept responsibility for her actions and express remorse in her recently penned "Victim Impact Statement and Self-Assessment," her words largely ring hollow and appear self-serving. Also unconvincing are Morgan's allegations that she would not pose a danger to the community if released and that her risk of recidivism is low given her age. ***Morgan committed her current twenty-two offenses when she was in her fifties, and the circumstances of those offenses coupled with her history and characteristics suggest that she would continue to pose a danger to the public if released.***

Doc. 510 at 12-13 (citations to record omitted) (emphasis supplied).

**D. The section 3553(a) factors independently preclude relief.**

Finally, this Court should not grant Morgan a reduction of sentence because the applicable sentencing factors in section 3553(a) weigh against release. As Judge Bucklew noted in 2021, there is a very real danger that, should Morgan be released

from prison, she would return to her old fraudster ways. Her conduct throughout the course of the four-year scheme and on the witness stand showed that she has an infinite capacity to visit harm on her fellow human beings so that she can live the luxurious lifestyle to which she believes she is entitled. As noted in its Opposition to Morgan's first motion, the concern about her likelihood of recidivism is heightened because during her incarceration, she—or her proxy—contacted at least one victim of the scheme to bemoan her situation and complain that the United States had been preventing her from "running her business." *See* Doc. 493 at 17-19.

At her original sentencing in April 2012, the Court had this to say about the impact of Morgan's criminal conduct:

> I just know that you have caused a substantial amount of harm to a lot of people, and you have not borne any responsibility for it. You've not said, "I'm wrong." You've not said, "I'm sorry." You've not done anything to try to repay anybody. … You used the funds for your own personal wants and needs while the victims were suffering everything from foreclosures to not being able to educate their children to having to—having to have a reverse mortgage to having a nervous breakdown; and I could recount a number of stories from the stories we heard at trial.

Doc. 443 at 137. In addition to protecting the public from further crimes and the seriousness nature of the offenses for which she was convicted, this Court should also consider the characteristics of the defendant (a fraudster who lied repeatedly under oath) in addition to the need for a lengthy sentence to promote respect for the law, provide just punishment for her crimes, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

In sum, this Court should deny Morgan's motion for compassionate release because she has not established that "extraordinary and compelling reasons" support a sentence reduction. But, even if Morgan had demonstrated such reasons, she nevertheless has not met her burden to show that a reduction is warranted in light of the danger that she would pose to the community, the seriousness of her criminal conduct, the need to promote respect for the law, to provide just punishment, and to afford adequate deterrence.

THEREFORE, this Court should deny Morgan's third motion for compassionate release.

Respectfully submitted,

ROGER HANDBERG
United States Attorney

By: *_/s/ Cherie L. Krigsman_*
Cherie L. Krigsman
Assistant United States Attorney
Florida Bar No. 0048764
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Cherie.Krigsman@usdoj.gov

**U.S. v. Marian Morgan** **Case No. 8:09-cr-585-TPB-TBM**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2024, a true and correct copy of the foregoing document and the notice of electronic filing were sent by United States Mail to the following non-CM/ECF participant:

Marian Morgan, 74212-083
Marianna Women's Prison Camp
P.O. Box 7006
Marianna, Florida, 32447

*/s/ Cherie L. Krigsman*
Cherie L. Krigsman
Assistant United States Attorney
Florida Bar No. 0048764
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: cherie.krigsman@usdoj.gov